PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

COPY

United States District Court for the Eastern District of New York

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ DEC 1 3 2010 ★
BROOKLYN OFFICE

Name: Luis Torres

Prisoner Identification no.: 05-A-1227

Place of Confinement: Five Points Correctional Facility

Name of Petitioner (include name under which convicted): Luis Torres

v.

Name of Respondent (warden or superintendent of institution): John B. Lempke,

COGAN, J.

## PETITION

1. Name and location of court which entered the judgment of conviction under attack Supreme Court, Kings County

CV 10- 5826

2. Name and address of lawyer who represented you N/A/

3. Date of judgment of conviction February 17, 2005

4. Length of sentence 23 1/2 years to life

5. Nature of offense involved (all counts) Murder in the Second Degree (NYPL §125.25[1])

6. What was your plea? (Check one)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐

If you entered a guilty plea to one count of indictment, and not a guilty plea to another count of indictment, give details:

7. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

8. Did you testify at the trial?
   Yes ☐ No ☒

9. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

RECEIVED
DEC 1 3 2010
PRO SE OFFICE

). If you did appeal, answer the following:

(a) Name of court Appellate Division, Second Department

(b) Name and address of lawyer who represented you
Joshua M. Levine

(c) Result Affirmed

(d) Date of result and citation, if known Dec. 26, 2007, 46 AD3d 925, 849 NYS2d 90

(e) Grounds raised See Exhibit A-B.

(f) If you sought further review of the decision by appeal to a higher state court, please answer the following:

(1) Name of court New York Court of Appeals

(2) Name and address of lawyer who represented you 10(b)

(3) Result Denied

(4) Date of result and citation, if known Jan. 18, 2007, 8 NY3d 850, 830 NYS2d 709

(5) Grounds raised See Exhibit A-B.

(g) If you filed a petition for writ of certiorari in the United States Supreme Court, please provide the date the petition was filed and the date of result and citation, if known

N/A

(1) Name and address of lawyer who represented you

11. Other than a direct appeal from the judgment of conviction and sentence have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
yes XX No ☐

12. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court Appellate Division, Second Department

(2) Name and address of lawyer who represented you Pro-se

(3) Nature of proceeding writ of error coram nobis

(4) Grounds raised (1) the court erred when it refuse defendant's request to be assigned a new trial counsel:(2) defendant was not present during material stages of the trial.

(5) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☒

(6) Date motion was filed with the Court July 30, 2008

(7) Date and result of motion Oct. 28, 2008,

(b) As to any second petition, application or motion give the same information:

(1) Name of court Kings County

(2) Name and address of lawyer who represented you Pro Se

(3) Nature of proceeding CPL 440.10 (1)(H)

(4) Grounds raised The admission of neuro pathologist's Report violated defendant's Confrontation

(5) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☑

(6) Date motion was filed with the Court Still pending

(7) Date and result of motion

(c) Did you appeal the decision of any petition, application or motion to the highest state court having jurisdiction?
(1) First petition, etc. Yes ☒ No ☐
(2) Second petition, etc. Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

13 STATE EVERY GROUND ON WHICH YOU CLAIM THAT YOU ARE BEING HELD UNLAWFULLY. IF YOU ARE RAISING THE SAME GROUNDS THAT YOU RAISED ON DIRECT APPEAL, YOU SHOULD ATTACH A COPY OF YOUR STATE COURT APPELLATE BRIEF. YOU MUST EXHAUST YOUR STATE COURT REMEDIES ON EACH GROUND YOU ARE CLAIMING YOU ARE BEING HELD UNLAWFULLY.

Point I

Ground(s): IN THIS CASE, IN WHICH THE JURY HAD TO DECIDE WHETHER APPELLANT INTENDED TO KILL OR MERELY TO CAUSE NON-FATAL SERIOUS PHYSICAL INJURY, APPELLANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE PROSECUTOR, IN SUMMATION, AND THE COURT, IN ITS FINAL CHARGE, TOLD THE JURY THAT THE LAW PRESUMES THAT A PERSON INTENDS THAT NATURAL AND PROBABLE CONSEQUENCES OF HIS ACTION. See Exhibit A, pgs 24, 30.

Point II

APPLLEANT'S GUILT WAS NOT PROVEN BEYOND A REASONABLE DOUBT, Exhibit B, pgs 17-20

Point III

THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE, Exhibit B, pgs 21-25.

Point IV

APPELLANT WAS DENIED PROCEDURAL DUE PROCESS, THROUGH INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF U.S. CONSTITUTIONAL AMENDMENT VI, AND THE N.Y CONSTITUTION, ARTICLE I, §6.

Point V

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE FROM HIS APPELLATE COUNSEL BECAUSE COUNSEL DID NOT RAISE THE FOLLOWING CLAIM: (1) THE COURT ERRED WHEN IT REFUSED DEFENDANT'S REQUEST TO BE ASSIGNED A NEW TRIAL COUNSEL: AND (2) DEFENDANT WAS NOT PRESENT DURING MATERIAL STAGES OF THE TRIAL.

VI

The admission of neuro pathologist's Report violated defendant's Constitution Rights.

4. **TIMELINESS OF PETITION:** If your judgment of conviction was made final over one year ago, you must set forth below why the one-year statute of limitations as codified in 28 U.S.C. § 2244(d) does not bar your petition.*

Petitioner habeas petition is not barred by the one-year statute of limitation because appellate counsel informimg him that his must filed habeas copurs petition in one year. See Holland v. Florida, __ U.S. __, 130 S.Ct. 2549 (2010)(in failing to provide prisoner with information that he had requested so that he could monitor case, and in failing to communicate with prisoner over period of years, rose to level of "extraordinary circumstances," of kind sufficient to permit equitable tolling of one-year statute). When petitioner was at Upstate C.F., P.O. Box 2001 Malone, NY 12953. Appellate Counsel Joshua M. Lavine, never mentioned to petitioner anything about a Habeas Corpud as well as he was not informed about there being a one-year statute of limitations.

When he was transfered to the new facility as which he reside now, Five Points C.F. As he was reserching at the law library, for the first time the law clark William Figueroa-91-A-2142 bring to his attention abotu AEDPA, statute limitations.

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" ) as codified in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

15. Do you have a petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐ No ☒

16. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: ______

(b) Give date and length of the above sentence: ______

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

11/25/10
(date)

[signature]
Signature of Petitioner

FPCF, P.O. BOX 119
Address

ROMULUS, NY 11451

I declare under penalty of perjury that on 11/25/10 (date), I delivered this petition to prison authorities to be mailed to the United States District Court for the Eastern District of New York.

______
Signature of Petitioner

# EXHIBIT

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 13 2010 ★
BROOKLYN OFFICE

# A

*To be argued by*
JOSHUA M. LEVINE
*(10 Minutes)*

# Supreme Court
# State of New York

APPELLATE DIVISION – SECOND DEPARTMENT

***TO BE HEARD ON THE ORIGINAL RECORD***

Kings County
Indictment No. 507/04

Appellate Division
Case No. 2005-01728

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*– against –*

LUIS TORRES,

*Defendant-Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for Defendant-Appellant
2 Rector Street, 10th Floor
New York, N.Y. 10006
(212) 693-0085

JOSHUA M. LEVINE
*Of Counsel*

# TABLE OF CONTENTS


STATEMENT PURSUANT TO RULE 5531 .......... 1

PRELIMINARY STATEMENT .......... 3

QUESTIONS PRESENTED .......... 4

STATEMENT OF FACTS

Introduction .......... 4

The People's Case at Trial .......... 5

The Prosecutor's Summation .......... 19

Charge and Verdict .......... 20

Sentencing .......... 22

ARGUMENT

POINT I

IN THIS CASE, IN WHICH THE JURY HAD TO DECIDE WHETHER APPELLANT INTENDED TO KILL OR MERELY TO CAUSE NON-FATAL SERIOUS PHYSICAL INJURY, APPELLANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE PROSECUTOR, IN SUMMATION, AND THE COURT, IN ITS FINAL CHARGE, TOLD THE JURY THAT THE LAW PRESUMES THAT A PERSON INTENDS THE NATURAL AND PROBABLE CONSEQUENCES OF HIS ACTIONS .......... 24

POINT II

APPELLANT'S SENTENCE, CLOSE TO THE MAXIMUM ALLOWED, WAS EXCESSIVE IN LIGHT OF HIS MINIMAL CRIMINAL JUSTICE HISTORY AND HIS WORK AND EDUCATIONAL BACKGROUND .......... 31

CONCLUSION .................................................. 33

CERTIFICATE OF COMPLIANCE Pursuant to 22 NYCRR § 670.10.3(f)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

---------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

LUIS TORRES,

Defendant-Appellant.

---------------------------------------------------------------X

STATEMENT PURSUANT TO RULE 5531

1. The indictment number in the court below was 507/04.

2. The full names of the original parties were the People of the State of New York against Enrique Maldonado, Angel Sanabria, Luis Torres, Ramon Ortiz, and Hiram Valentin. This appeal is on behalf of Luis Torres only.

3. This action was commenced in Supreme Court, Kings County.

4. This action was commenced by the filing of an indictment on February 11, 2004.

5. This appeal is from a judgment convicting appellant, after a jury trial, of murder in the second degree.

6. This is an appeal from a judgment of conviction rendered February 17, 2005.

PRELIMINARY STATEMENT

Appellant appeals from a judgment of the Supreme Court, Kings County, rendered on February 17, 2005, convicting him, after a jury trial, of murder in the second degree (P.L. § 125.25[1]), and sentencing him to a prison term of 23½ years to life (Demarest, J., at trial and sentence).

Timely notice of appeal was filed, and this Court, on May 20, 2005, granted appellant poor person relief and assigned Lynn W. L. Fahey as appellate counsel.

Appellant is currently incarcerated pursuant to the above judgment. No application for a stay of execution of judgment has been made.

Appellant had four co-defendants below, each of whom pleaded guilty in satisfaction of the charges against him. Enrique Maldonado pleaded guilty to attempted second-degree gang assault and, on September 23, 2004, was sentenced to six months' incarceration and five years' probation. Angel Sanabria pleaded guilty to first-degree assault and, on November 4, 2004, was sentenced to seven years' imprisonment and five years of post-release supervision. Hiram Valentin pleaded guilty to third-degree assault. And, pursuant to a cooperation agreement with the District Attorney, Ramon Ortiz pleaded guilty to second-degree assault in exchange for a promised sentence of 1½ to 3 years' imprisonment. Ortiz testified on behalf of the People at appellant's trial.

QUESTIONS PRESENTED

1. In this case, in which the jury had to decide whether appellant intended to kill or merely to cause non-fatal serious physical injury, was appellant deprived of a fair trial when the prosecutor, in summation, and the court, in its final charge, told the jury that the law presumes that a person intends the natural and probable consequences of his actions?

2. Was appellant's sentence, close to the maximum allowed, excessive in light of his minimal criminal justice history and his work and educational background?

STATEMENT OF FACTS

**Introduction**

Appellant was indicted for murder pursuant to allegations that he struck Valery Charnavus in the head with a baseball bat during a street brawl, killing him. Appellant was also charged with acting in concert to assault three colleagues of Charnavus's who were also involved in the brawl, Sergey Hurtin, Vadim Ranov, and Boris Vasiliev. At trial, the jury, charged on intentional murder and, in the alternative, manslaughter, had to determine whether the People had proved that appellant intended to kill Charnavus or only intended non-fatal serious physical injury. In summation, the prosecutor stated that the law presumes that people intend the natural consequences of their actions. The court included

virtually identical language in its intent charge, instructing the jury that a "person is presumed, by law, to intend the natural and probable consequences of his acts." At no time did the prosecutor or court state that this presumption was permissive, rather than mandatory. The jury convicted appellant of murder and acquitted him of assaulting Hurtin. The charges as to Ranov and Vasiliev were withdrawn during deliberations.

**The People's Case at Trial**

Sergey Hurtin and Sergey Gorlov were laborers for the S & S Group, a construction company with a garage at Ingraham Street and Varick Avenue in Brooklyn (Hurtin: 200-201, 230; Gorlov: 264-266, 272).[1] Hurtin, Gorlov, and their co-worker Vadim Ranov worked at the garage on January 12, 2004, while Boris Vasiliev and Valery Charnavus, who also worked for S & S, were at a job site away from the garage (Hurtin: 200-201, 204; Gorlov: 265-268). All five men were originally from either Russia, Ukraine, or Latvia, and spoke Russian; only Hurtin had any fluency in English (Hurtin: 199, 208-209, 228-230, 248-249; Gorlov: 274, 295).

---

[1]Numbers in parentheses without prefix refer to the trial minutes. Those preceded by "S." refer to the sentencing minutes, and those by "PSR." to the Department of Probation's Pre-Sentence Report.

Hurtin knocked off work around 2:30 p.m. and went to buy a five-liter bottle of wine and some beer, which he brought back to the garage (Hurtin: 202-203, 231). Gorlov and Ranov drank beer all morning and afternoon, then, at about 4:00 p.m., began drinking brandy (Hurtin: 203, 233; Gorlov: 265-268, 296-298, 298). Hurtin drank the entire bottle of wine he bought, as well as brandy afterward (Hurtin: 203, 231-232; Gorlov: 297-298).[2]

Vasiliev and Charnavus returned to the garage in their truck around 9:00 or 9:30 p.m., by which time the other three had finished the brandy and wine (Hurtin: 203-204, 232, 234; Gorlov: 268, 298). For the next hour, all five men unloaded the truck and reloaded it with the tools that would be needed for the next day's job (Hurtin: 204, 234-235; Gorlov: 269-270, 299). When they were done, they resumed drinking (Hurtin: 204, 236; Gorlov: 270, 300). Charnavus had brought some vodka, which he drank with Vasiliev, Gorlov, and Ranov, while Hurtin drank beer (Hurtin: 204, 236; Gorlov: 270, 300).

None of the men was planning on going home that night (Hurtin: 205, 229; Gorlov: 270-271). Rather, they were going to stay at the garage and drink, in celebration of a Russian holiday (Hurtin: 202, 205). At around midnight, running

---

[2]The night before he testified, Gorlov drank an entire bottle of vodka, despite having been advised by the District Attorney not to drink that night (269, 300-301).

out of cigarettes and alcohol, the five men left the garage to look for a store where they could buy cigarettes, beer, and vodka (Hurtin: 204-205, 238-240; Gorlov: 271-272). They walked to Knickerbocker Avenue, where there was a restaurant next to a 24-hour grocery store that sold items through a window (Hurtin: 206-207, 238-241; Gorlov: 271-272).

At about the same time, Anthony Garcia left his girlfriend's apartment on Jefferson Street for a store on Wilson Avenue, half a block away, to buy cigarettes (576-578, 623, 636-637).[3] On his way there he saw, standing on the corner of Jefferson and Wilson, appellant (whose nickname was "Tummer"), co-defendant Angel Sanabria (whose nickname was "Doe"), and another man, Charlie (579-583, 623, 639-640). Appellant and Charlie were arguing with each other while Sanabria stood nearby, and Garcia stopped to watch (583, 639). After a minute or two of jawing at each other, appellant and Charlie began fist-fighting (583-584, 644-647, 712). The fight ended abruptly when Charlie picked up a bottle and

---

[3]Eighteen years old at trial, Garcia was a ninth-grade dropout who, at the time of the incident, was enrolled in a G.E.D. program with co-defendant Hiram Valentin (574, 628, 631). At that time, Garcia was in a thirteen-month drug-treatment program pursuant to his guilty plea to a felony charge of attempted sale of crack (626-627, 635-636). He smoked marijuana the day of the incident, despite that being a violation of the program rules (634, 636).

cracked appellant hard on the head with it, causing him to stagger backward (583-584-585, 647-648).

The fight over, Charlie proceeded on Wilson toward Melrose Street while appellant and Sanabria headed up Jefferson toward Knickerbocker, in the direction from which Garcia had just come (585-586, 589, 623-624, 649-650). Being "nosey" and "want[ing] to know what [was] going to happen," Garcia followed about 15 feet behind them (586-587, 589, 623-624, 651-652). Appellant had blood on the side of his head (604-605, 649-650, 697-698).

Appellant and Sanabria turned onto Knickerbocker and stopped near the 24-hour store (589, 654-655). There were five or six other people in front of the store and restaurant, including co-defendants Hiram Valentin, whose nickname was "Kiddo," and Ramon Ortiz, whose nickname was "Munchy" (Ortiz: 330; Garcia: 590-592, 656-657).[4] Garcia got on line at the store window (Garcia: 655-

---

[4]Ortiz gave his last name at trial as "Perez" (328-329), but admitted on cross-examination that "Perez" was an alias he had also given police on a prior felony arrest, and that his real last name was "Ortiz" (493-494). In accordance with a cooperation agreement, on August 10, 2004, Ortiz pleaded guilty to attempted second-degree assault in exchange for a promise of a sentence of 1½ to 3 years' imprisonment (332, 403, 484, 486-487).

Ortiz had several other contacts with the criminal justice system. Between 2000 and 2003, he had misdemeanor or violation convictions for disorderly conduct (395), criminal mischief (375, 396), criminal contempt (375, 397-398), (continued...)

657). Ortiz, who had been at his girlfriend's apartment nearby, was on his way to the 24-hour store to buy cigarettes at around midnight, and he, too, saw Sanabria and appellant, who was still bleeding from the top of his forehead, standing on the corner (334-335, 337, 340-343, 385, 408-410, 419, 423, 425-426, 470).

Briefly separating from the other four Russian-speaking white men, Ranov walked into the office of Bushwick Car Service, across the street from the 24-hour store and restaurant, where Giovanny Lema was working as a dispatcher (Lema: 29-35, 70, 73-74; Gorlov: 274, 303). Stumbling and smelling of alcohol, Ranov said twice to Lema, "I want vodka" (Lema: 32, 74-75). Lema said he could get Ranov a taxi if he wanted, but not vodka, and suggested that he go to the 24-hour store, whereupon Ranov left and joined his companions across the street in front of the restaurant (Lema: 32-34, 74-76, 880).

---

[4](...continued)
assault (375-376, 398-399), and petit larceny (376, 400). And on either September 30, or November 18, 2003, he was convicted of criminal sale of a controlled substance in the fifth degree, a felony, for having sold crack to an undercover police officer, and was sentenced to five years' probation (376, 395, 400-401). He violated the conditions of his probation by smoking marijuana and drinking beer on the day of the instant incident; by being involved in and getting arrested for the incident; and by fighting during his incarceration for this case at Riker's Island (330, 402-403, 405, 489). He also acknowledged that, after the incident, he lied to police and an assistant district attorney about what happened (421-423, 466).

Ranov, Vasiliev, and Charnavus entered the restaurant to see if they could buy some vodka, while Hurtin and Gorlov waited outside (Hurtin: 207-208, 241-242; Gorlov: 272-273). After learning that they could get waiter service but could not buy vodka to take out, they came back outside, not having bought anything (Hurtin: 207-208; Gorlov: 273).[5] Deciding to buy beer, cigarettes, and something to eat at the 24-hour store, Hurtin and Vasiliev headed toward the sales window while the other three waited on the sidewalk (Hurtin: 208-210, 243; Gorlov: 274). At that point, there were several Hispanic men in front of the store and restaurant (Lema: 35-36, 81, 88-89; Hurtin: 210, 245-246; Gorlov: 274-275, 305, 307, 310; Ortiz: 343-344, 354, 385; Garcia: 656-657).

One of the white men stumbled drunkenly into Garcia (Garcia: 594). Garcia gave the man a shove with his elbow and told him to "watch it," whereupon the man gave Garcia a dirty look, moved back a bit, and started acting "crazy" (Garcia: 594, 676-677). According to Garcia, all five white men were drunk, wobbly, "acting heavy," and starting problems (593-594, 663-664).

At that point, an argument broke out between the white and Hispanic men. Lema recalled watching from his desk as the Hispanics began talking to the white men as if arguing with them (34, 82-83). Garcia heard one white man who was

---

[5]Garcia recalled seeing all five men exit the restaurant (592, 661).

"hyped up" say to the Hispanic men, "Puerto Ricans are shit" and "Russians are the best," and warning them, "[D]on't fuck with us Russians" (594, 665-666, 678). He recalled appellant arguing with that man while one of the other white men tried to intercede and get between them, telling appellant not to worry, that everything was "cool," and that his own best friend was Puerto Rican (595, 597, 666-667). The first white man kept acting up, however, yelling in appellant's face, as if he wanted to fight (595, 668). Ortiz also heard some arguing in English, including some cursing, but did not pay it much mind or hear most of what was said (345-346, 429, 442-443), while Gorlov recalled that the Hispanic men were directing obscenities at Hurtin (275-276, 307-308).

According to Hurtin, one of the Hispanic men said, "What are those fucking Poles doing over here" (210-211, 245-247). Hurtin responded that they were Russian, not Polish, whereupon one of the Hispanic men asked what Russians were doing in their neighborhood at that hour, and others in the crowd directed some additional derogatory remarks at them, calling them "Russian swines" [*sic*] (211-212, 246-247). Hurtin claimed he tried to "chill[] down both sides" by announcing politely, in both English and Russian, that he and his friends would depart as soon as they got their purchases from the store (212, 249-250).

A brawl broke out about then between the Hispanic and white men. Ortiz said it began when someone said, "hit him," and Sanabria punched one of the white men in the face (345-346, 429-430, 441-442). Garcia similarly recalled that Sanabria, who was standing near appellant, "came out of left field" and punched the white man who had been arguing with appellant in the face or ear, causing him to stagger back (596, 669-670), while Lema recalled seeing the Hispanic men begin to punch and kick the white men, who ran up the block a bit (36, 64, 83, 85). According to Gorlov, he and his companions had begun walking away toward the garage when two or three of the Hispanic men suddenly ran up to Ranov and Vasiliev, jumped on them, and hit them (276-277, 309-311). Hurtin similarly testified that he and his companions had begun walking back toward the garage when someone kicked him in the back while two other men jumped on Vasiliev (212-213, 251-252).

Garcia said that the brawl, which had started out with the five white men fighting appellant and Sanabria, soon spread to around a five-on-five, whites against Hispanics, now including Valentin, Ortiz, and a black man who joined the Hispanics (597-601, 665, 670-672). Everybody on both sides was "fighting hard" and throwing hard punches (596, 674-675). Ortiz jumped in the moment Sanabria threw the first punch, joining appellant, Sanabria, and Valentin in the fight against

the white men, knocking one of them down with a punch to the face, then kicking him on the ground (Ortiz: 346, 348, 442-444). At one point during this "big fight" (Ortiz: 347), Ortiz picked up a large metal garbage can and threw it at one of the white men, who blocked it with his hands (Ortiz: 350-351, 447-448).

The fight continued for several minutes (Hurtin: 214, 253; Gorlov: 277-280, 312-314; Ortiz: 347-349; Garcia: 431, 597, 600, 675), until there was a lull in the action — the fighting either stopped completely or dissipated somewhat — and the white men moved to one side of the street while the Hispanics moved to the other (Lema: 38, 89; Hurtin: 215, 254-255; Gorlov: 280-281, 314; Ortiz: 350-354, 377-378, 448-449, 452-453; Garcia: 688). But the two groups continued to yell at each other (Ortiz: 449-451, 456-457).

At about that point, co-defendant Enrique Maldonado pulled up in a car and asked the Hispanic men if they wanted a bat (Lema: 37-39, 89, 95-96; Ortiz: 356-358, 451, 457-458, 487, 495; Garcia: 600-601, 679). Sanabria said he did, whereupon Maldonado got out of his car, fetched a wooden baseball bat from either the trunk or back seat and handed it to Sanabria, then got back in his car and drove away (Lema: 38-39, 41, 95-98; Ortiz: 358-359, 371, 461-462, 464, 466-467; Garcia: 601-603, 614-615, 624-625, 684-685, 687, 694). Some of the Russian and Hispanic men then began walking toward each other in the middle of the street

where they resumed fighting, throwing punches at each other again (Ortiz: 462-463, 467, 469-471).

Hurtin took out his cell phone to call 911. (He might have announced that he was going to "call his lawyer.") (Lema: 40, 99-100; Hurtin: 216; Ortiz: 355-356, 449-450, 467). Before he could make the call, however, someone kicked the phone from his hand and Sanabria ran up to him and cracked him hard on the right side of the head with the bat, causing him to fall to the ground (Lema: 41, 45, 99-100, 102-104, 106; Hurtin: 216-218, 256; Ortiz: 359-360, 471-472). As a couple of Hurtin's colleagues picked him up and helped him to the corner, Sanabria handed the bat off to appellant and another one of the Hispanic men picked up Hurtin's phone and put in his pocket (Lema: 41-43, 45-46, 104, 106-107, 110; Gorlov: 282, 317; Ortiz: 362-363, 473-474). Charnavus stumbled drunkenly over to the man who had pocketed the phone, apparently demanding its return and trying to reach into the man's pocket (Lema: 42, 44-45, 107-108). Either that man or Sanabria punched him in the face, causing him to fall to the ground, whereupon appellant, now holding the bat, hit him in the head with it (Lema: 42-45, 48, 112-113; Ortiz: 363, 475-476).

Lema testified that appellant struck Charnavus three times on the head with the bat, then, still holding the bat, walked away on Jefferson toward Irving

Avenue, while the other Hispanic men ran off (44-46, 49, 55-56, 113-114). According to Ortiz, appellant knocked Charnavus down with the first blow, then struck him three or four more times with the bat as he tried to get up and block the blows with his arms, some of them hitting him in the head and some on his arms (363-365, 476-481).

According to Garcia, appellant was walking with the bat when one of the white men bashed him in the back of the head with a garbage can, causing him to fall to his knees and drop the bat. Valentin picked it up and began swinging at another of the white men. Valentin mostly missed but caught the man once in the torso (605-607, 690, 692-696). Meanwhile, appellant, blood on his face and in his hair, stood for a few moments "trying to get himself back together" (696-698). Then, having gotten the bat back, he struck Charnavus once on the head with it, causing him to fall to the ground and shake "[l]ike he was having a stroke or something" (607-610, 614, 698-701). Sanabria and the black man then picked Charnavus up by his arms, propping him up on his knees, while appellant struck him a second time with the bat, hitting him either in the face, neck, head, or shoulder (609-611, 700-702). The two men propping Charnavus up then dropped him back to the ground (611-612, 703). Appellant pointed at Charnavus, said

some things to him, then hit him a third time with the bat, after which someone finally dragged Charnavus away to the sidewalk (612-614, 704).[6]

Ortiz said the fighting stopped when he called out that the police were coming and he and and the other Hispanic men ran off in different directions. Appellant was still holding the bat (365-367, 483, 492).

Gorlov did not see Charnavus get hit with the bat. Rather, he was fighting when he heard a scream from his right, turned, and saw Charnavus fall to the ground while the Hispanic men ran away in different directions (284-285, 318-319, 325). Charnavus was unconscious, not moving, and blood was coming from his head (284-285, 320). Hurtin did not see what happened to Charnavus, either, and only saw him on the ground breathing "really hard" while Vasiliev held his (Charnavus's) head (218-220).

Ambulance personnel and police arrived on the scene within moments (Lema: 50-52; Hurtin: 220-221; Gorlov: 285-287; P.O. Joseph Mangiaracina: 501, 507; Garcia: 614, 616, 705-708). Hurtin and Vasiliev, both of whom were drunk, were taken by ambulance to Bellevue Hospital in Manhattan (Dr. James Keating: 178, 190-191; Hurtin: 223; Mangiaracina: 504); Charnavus was brought to Elmhurst Hospital (Dr. Christopher Happy: 141); and both Gorlov, who was drunk

[6]Garcia did not see anyone hit Hurtin with the bat (616-617).

and had a bloody nose and lip and some bruising to his face and hands, and Ranov, who was drunk but did not at that point appear to be injured, refused medical attention and were taken directly to the 83rd Precinct station house (Gorlov: 287-289, 294; Mangiaracina: 503-504, 506-508; Det. Joyce Mariner: 522).

Hurtin had a laceration and bruising to his face, fractures to the face and head, and an epidural hematoma, and two of his teeth were loose (Keating: 178-184; Hurtin: 224-225; Mangiaracina: 503; Mariner: 523). He had a blood alcohol content of .376 (Keating: 185).[7] He received ten stitches and was released from the hospital the next day. Vasiliev had two lacerations on the abdomen which required suturing (Gorlov: 287-288; Keating: 190-193; Mangiaracina: 503; Mariner: 525).

Charnavus, who had a blood alcohol content of .241, was pronounced dead on January 20, 2004, about a week after the incident, never having regained consciousness (Happy: 145-146, 156, 168). He had extensive comminuted (criss-crossing) skull fractures, almost all on the left side of his head; one epidural, one subdural, and one subarachnoid hemorrhage; a 3½-inch laceration to the left side of the head above the temple; an abrasion or scratch on the right side of the head; an abrasion or scratch on the chin; and a bruise on the right shin with an abrasion just

[7]The legal blood alcohol content limit for driving was .08 (Happy: 146).

below it (Happy: 123-124, 126-129, 131-132, 134-135, 157, 160-165). The skull fractures were consistent with his having been struck on the head with a baseball bat one or more times (Happy: 133, 163, 165).

Ranov lifted his shirt at the precinct station house to show that he had been stabbed in the torso, whereupon police summoned an ambulance to transport him to Elmhurst Hospital (Happy: 149, 152; Gorlov: 287, 289; Mangiaracina: 508-509). His only injury was a three-centimeter laceration or stab wound on his right side, which was not deep (Happy: 151-152, 154-155; Gorlov: 289-290; Mangiaracina: 508; Mariner: 522, 527). His blood alcohol content was .247 (Happy: 152, 156).

Police conducted several lineups about a week after the incident. Lema and Garcia identified appellant in one (Lema: 65-67, 116-117; Mariner: 544, 553-554, 562; Garcia: 621), and Ortiz in another, Lema recognizing Ortiz as the man who pocketed Hurtin's cell phone (Lema: 117; Hurtin: 227; Mariner: 554-556, 562-564; Garcia: 622). Hurtin identified Valentin in another lineup (Hurtin: 227-228; Mariner: 556-558, 564).

On January 16, 2004, the day police took him into custody, appellant waived his *Miranda* rights and made an oral statement to police, followed by a statement in similar substance, on videotape, to an assistant district attorney. Appellant said in those statements that he was walking on Wilson Avenue and George Street in

Brooklyn with his cousin "Doe" when a white van pulled up. Some Mexican men jumped out of the van, beat appellant, and struck him on the head with a baseball bat, causing him to sustain a laceration. When the assailants stopped the attack and left, appellant and Doe continued walking, toward appellant's home. On the way there, as they approached Knickerbocker and Jefferson, they ran into "Munchy." Appellant decided to buy something to drink at the store on the corner. As he was approaching the store window, he saw some Hispanic and white men arguing with and pushing each other. Appellant threw a few punches at one of the white men, then said, "relief," and went home. At one point, one of the white men tried to use his cell phone, saying he was going to call his lawyer (Mariner: 532-533, 538-541; People's Exhibit 17: 549).

**The Prosecutor's Summation**

Addressing the intent element of the murder and manslaughter charges,[8] the prosecutor told the jury:

> Defendant's intent is at issue, among other things and if you find that the defendant hit [Charnavus] in the head with a baseball bat you have to decide what was the defendant's intent at that time.

---

[8]With no opposition from the People, the court had granted appellant's request to submit first-degree manslaughter as a lesser included offense of intentional second-degree murder (744, 752, 754).

> I submit to you that the defendant's intent to kill could not be more clear. Defendant hit [Charnavus] in the head with a baseball bat as hard as he could and the law presumes that people intend to in the natural consequences of their actions [*sic*] if you hit someone in the head with a baseball bat as hard as you can, what is the natural consequence of that action, you might kill the guy but the defendant doesn't stop there, when [Charnavus] is on the ground the defendant hits him again and again and again three times, four times, I don't know exactly how many times because nobody is sitting there with one of those little clickers recording the whacks but I submit to you with every swing of that bat the defendant [*sic*] intent to kill [Charnavus] becomes more and more clear.
>
> * * *
>
> He was hitting the guy in the head as hard as he could and, that is intent to kill, that is not manslaughter. There is no intent to inflict serious physical injury.
>
> * * *
>
> [T]he guy was beat in the head with a baseball bat and that is intent to kill (861-863).

**Charge and Verdict**

Noting that appellant's conduct in striking Charnavus with the bat was "clearly intentional" but that it was for the jury to determine whether his intent was to kill, the court dismissed the depraved indifference (reckless) murder count (742-743). It submitted second-degree (intentional) murder (892-894) to the jury in the

alternative to first-degree manslaughter as a lesser included offense (894-897). As to Hurtin, the court submitted first- and second- degree assault, instructing the jury that appellant was charged with acting in concert with another as to those charges (899-903).[9]

After instructing the jury that the People bore the burden of proving every element of the charges beyond a reasonable doubt (888-889), the court charged the jury on intent as follows:

> Intent means conscious objective or purpose.[10] A person acts with intent to cause the death of another when that person's conscious objective or purpose is to cause the death of another.
>
> Intent does not require premeditation. Intent does not require advanced planning nor is it necessary that the intent be in a person's mind for any particular period of time. The intent can be formed and need only exist at the very moment that the person engages in the prohibited conduct or acts to cause the prohibited results and not necessarily at any earlier time.

---

[9]The court also submitted second-degree assault charges as to Ranov and Vasiliev (904-906), but, with the consent of both parties, later withdrew those counts from the jury's consideration with the understanding that there would be "no retrieving" them by the District Attorney (914-921).

[10]While charging the jury on the murder, manslaughter, and assault counts, the court stated again that intent means "conscious objective" or "purpose," but did not otherwise elaborate (896, 900, 902).

> The questions arises as to how to determine whether or not the defendant had the intent required for the commission of the crime. To make that determination you must decide if the required intent can be inferred beyond a reasonable doubt from the proven facts.
>
> In doing so you may consider the person's conduct and all of the circumstances surrounding that conduct including what, if anything, the person did or said, what result followed the person's conduct and was that result the natural necessary and probable consequence of that conduct.
>
> A person is presumed, by law, to intend the natural and probable consequences of his acts (893-894).

At no time did the court tell the jury that the presumption that a person intends the natural and probable consequences of his acts was permissive, rather than mandatory.

The jury convicted appellant of the intentional murder of Charnavus, but acquitted him of the assault charges as to Hurtin (926-927).

**Sentencing**

Appellant, who was born on December 28, 1977 (PSR. 1), had only one prior contact with the criminal justice system: on June 14, 1995, he pleaded guilty to seventh-degree criminal possession of a controlled substance, was adjudicated a youthful offender, and was sentenced to three years' probation (S. 4-5; PSR. 2, 6;

D.C.J.S. report, Supreme Court file). Appellant dropped out of school after completing the 11th grade, but later earned his G.E.D. He also studied Human Resources at Boricua College in Brooklyn, and was employed as a construction worker, a supervisor in a mail department at Prudential Securities in Manhattan, and a manager at a Taco Bell restaurant (PSR. 8).

Prior to trial, the People agreed to recommend a determinate sentence of 15 years in exchange for appellant's guilty plea to first-degree manslaughter (Minutes of January 6, 2005, pp. 7-8, 13). At sentencing, the prosecutor asked the court to impose "something close to the maximum sentence" (S. 5), while defense counsel, noting that there was no evidence that, prior to the fight, appellant was targeting or seeking to injure anyone, asked the court to impose the minimum sentence of 15 years to life (S. 5-6). The court opined that appellant's crime was "truly a heinous offense" and that, notwithstanding his lack of a record of violent offenses, he merited a "very substantial sentence." It imposed a prison term of 23½ years to life (S. 6-8).

# ARGUMENT

## POINT I

IN THIS CASE, IN WHICH THE JURY HAD TO DECIDE WHETHER APPELLANT INTENDED TO KILL OR MERELY TO CAUSE NON-FATAL SERIOUS PHYSICAL INJURY, APPELLANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE PROSECUTOR, IN SUMMATION, AND THE COURT, IN ITS FINAL CHARGE, TOLD THE JURY THAT THE LAW PRESUMES THAT A PERSON INTENDS THE NATURAL AND PROBABLE CONSEQUENCES OF HIS ACTIONS.

Once the jurors concluded, as they obviously did, that appellant had wielded the bat against Charnavus, the crucial issue became what appellant's intent was when, dazed and bleeding in the middle of a street brawl, after having been cracked on the forehead with a bottle and slammed in the back of the head with a metal garbage can, he struck Charnavus with a baseball bat. Significantly, the court, with no objection from the prosecutor, granted appellant's request to submit first-degree manslaughter for the jury's consideration in the alternative to second-degree murder. But, in charging the jury that "[a] person is presumed, by law, to intend the natural and probable consequences of his acts," the court in effect directed the jury to find that appellant did, indeed, have the intent to kill. This erroneous charge, aggravated by the prosecutor's similar burden-shifting misstatement of the law in

summation, effected a fundamental error of constitutional dimension requiring reversal and a new trial. U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

In *Sandstrom v. Montana*, 442 U.S. 510 (1979), the United States Supreme Court ruled that a jury instruction that the law presumes that a person intends the ordinary consequences of his voluntary acts constituted an impermissible mandatory evidentiary presumption that improperly relieved the prosecution of its burden of proving the defendant's intent. Addressing a similarly infirm jury instruction in *Francis v. Franklin*, 471 U.S. 307 (1985), the Court explained that the Due Process clause of the Fourteenth Amendment to the U.S. Constitution protects a criminal defendant against conviction except on proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged, and that this principle prohibited evidentiary presumptions in jury charges that effectively relieved the prosecution of its burden to prove beyond a reasonable doubt every essential element of a crime. 471 U.S. at 313.

Appellate Courts in this State have consistently and correctly applied these now well-settled principles in reviewing criminal prosecutions. *See People v. Marr*, 50 N.Y.2d 456 (1980); *People v. Byas*, 172 A.D.2d 242 (1st Dep't 1991); *People v. Ramos*, 83 A.D.2d 817 (1st Dep't 1981). An instruction that a person is presumed to intend the consequences of his acts will *only* pass federal and state

constitutional muster if the court also explicitly informs the jury that the presumption is a *permissive* one that it *may* draw if warranted by the facts. *People v. Brensic*, 119 A.D.2d 281, 312 (2d Dep't 1986), *rev'd on other grounds*, 70 N.Y.2d 9 (1987).

In this case, on appellant's request and without opposition by the People, the court submitted first-degree manslaughter to the jury as a lesser included offense of second-degree murder. Thus, the court recognized that there was a reasonable view of the evidence that appellant's intent was to cause non-fatal serious physical injury, rather than death. Nevertheless, the court also instructed the jury that a "person is presumed, by law, to intend the natural and probable consequences of his acts" (894). This instruction was untempered by language, similar to that in *Brensic*, emphasizing that the presumption was "a *permissive* presumption which the jury *may* draw if warranted by the facts." *Brensic*, 119 A.D.2d at 312 (emphasis in original). The charge, therefore, ran afoul of *Sandstrom* and its progeny, essentially directing a finding (once the jury concluded that appellant had wielded the bat against Charnavus) that appellant did, indeed, intend to cause death, and thus removing first-degree manslaughter from the jury's consideration. The charge, virtually identical to those repeatedly condemned by the U.S. Supreme Court and by Courts of this State, therefore violated due process. *Franklin*, 471

U.S. 307; *Sandstrom*, 442 U.S. 510; *Marr*, 50 N.Y.2d 456; *Byas*, 172 A.D.2d 242; *Ramos*, 83 A.D.2d 817; *cf. Brensic*, 119 A.D.2d 281.

The prosecutor's summation comment in the same regard, that "the law presumes that people intend . . . the natural consequences of their actions" (862), likewise violated due process and constituted a serious misstatement of the law.

The due process violation engendered by the court's erroneous charge and prosecutor's summation comment requires reversal without resort to a harmless error analysis. A plurality of the United States Supreme Court, in *Connecticut v. Johnson*, 460 U.S. 73 (1993), held that a jury charge that "'the law presumes that a person intends the ordinary consequences of his voluntary acts'" could not be harmless error in a case in which intent was in issue because the jury could have viewed the instruction as creating a conclusive presumption of intent or shifting the burden of proof as to that element:

> An erroneous presumption on a disputed element of the crime renders irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence. If the jury may have failed to consider evidence of intent, a reviewing court cannot hold that the error did not contribute to the verdict. The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant.

460 U.S. at 85-86 (internal footnote references omitted); *accord*, *People v. Balkum*, 94 A.D.2d 933 (4th Dep't 1983), *citing Johnson*, *supra* ("*Sandstrom* instruction was clearly not harmless error inasmuch as it created a conclusive presumption of intent") (internal parenthetical citation omitted); *see also People v. Daly*, 98 A.D.2d 803, 807 (2d Dep't 1983) (Lazer, J.P., dissenting); *but see Franklin*, 471 U.S. at 325 ("This Court has not resolved whether an erroneous charge that shifts a burden of persuasion to the defendant on an essential element of an offense can ever be harmless").

Even assuming, *arguendo*, that harmless error analysis is required, the erroneous charge at issue here cannot be considered harmless beyond a reasonable doubt. The evidence showed that appellant was bleeding when he struck Charnavus with the bat, having been cracked in the head with a bottle, and that one of Charnavus's colleagues had just bashed appellant in the back of the head with a metal garbage can, knocking him to his knees and forcing him to stop to gather himself. From this and the other evidence, the jury could have determined that appellant intended to cause non-fatal serious physical injury to Charnavus, or at least could have harbored a reasonable doubt as to whether appellant intended to kill him. Indeed, the very fact that Charnavus lived for a week after the attack could have given rise to a reasonable doubt that appellant intended his death.

But the court's intent charge and the prosecutor's summation comment effectively took these options off the table, directing the jury to find that appellant intended to kill Charnavus when he struck him with the bat. The charge effected a fundamental error of constitutional dimension on an issue of vital importance (appellant's intent) that cannot be considered harmless beyond a reasonable doubt. *Franklin*, 471 U.S. at 325 (*Sandstrom* error could not have been harmless); *Marr*, 50 N.Y.2d at 465 (erroneous intent charge could not have been harmless when defendant's intent was vital issue); *Ramos*, 83 A.D.2d at 818 (same).

The *Sandstrom* error was not negated by the court's instruction that the People bore the burden of proving every element of the charges beyond a reasonable doubt (888-889). This Court "cannot assume that the jurors, faced with two opposite and mutually exclusive charges, had the wit and ability, with unanimity, to adopt the right one and reject the wrong one . . . . Since a reasonable juror could have interpreted the court's instructions as creating a legal presumption as to the element of intent, . . . [appellant] was denied a fair trial." *Byas*, 172 A.D.2d at 243; *see also Franklin*, 471 U.S. at 319-320 (general instructions as to the prosecution's burden and the presumption of innocence did not dissipate *Sandstrom* error); *Cox v. Donnelly*, 267 F.Supp.2d 418, 423-424 (E.D.N.Y. 2003) (same).

Appellant's counsel interposed no objections to the court's charge or the prosecutor's comment regarding intent. This Court should nevertheless reach this issue and reverse in the interest of justice because the erroneous instruction and prejudicial summation comment involved a critical element of the charges, and reasonable jurors could have assumed there was a conclusive presumption that appellant intended death. *People v. Gardner*, 163 A.D.2d 892, 893 (4th Dep't 1990) (reversing in the interest of justice when intent charge violated *Sandstrom*); *People v. Alvarez*, 96 A.D.2d 864 (2d Dep't 1983) (same); *Balkum*, 94 A.D.2d 933 (same); *People v. Rudney*, 83 A.D.2d 746 (4th Dep't 1981) (same); *People v. Harris*, 77 A.D.2d 804 (4th Dep't 1980) (same).

In the alternative, this Court should reverse because appellant's counsel's failure to object to the erroneous charge and summation comment constituted deficient performance that prejudiced appellant, *see Strickland v. Washington*, 466 U.S. 668, 687-688 (1984), and deprived him of "meaningful representation," *see People v. Baldi*, 54 N.Y.2d 137, 147 (1981). *See Cox*, 267 F.Supp.2d 418;[11] *see*

---

[11]In *Cox*, the District Court granted a petition for a writ of *habeas corpus* based on the petitioner's trial counsel's inexcusable failure to object to an intent instruction that ran afoul of *Sandstrom*. On appeal, the Second Circuit ruled that it could not characterize counsel's failure to object to be reasonable, but vacated and remanded to the District Court for a *Sparman* hearing (*see Sparman v. Edwards*, 154 F.3d 51 [2d Cir. 1998]), to give counsel an opportunity to present evidence (continued...)

*also Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) (trial counsel deficient for failing to object to faulty instruction on intent in murder prosecution), *cert. denied*, 537 U.S. 1107 (2003); *People v. Andrew S.*, 108 A.D.2d 935, 939 (2d Dep't 1985) (counsel ineffective for, *inter alia*, failing to object to intent charge that violated *Sandstrom*).

POINT II

APPELLANT'S SENTENCE, CLOSE TO THE MAXIMUM ALLOWED, WAS EXCESSIVE IN LIGHT OF HIS MINIMAL CRIMINAL JUSTICE HISTORY AND HIS WORK AND EDUCATIONAL BACKGROUND.

Appellant was 27 years old when the court sentenced him in this case. His only prior contact with the criminal justice system involved his guilty plea, when he was 17 years old, to misdemeanor drug possession, for which the court adjudicated him a youthful offender and sentenced him to probation.

Appellant's educational and employment background was also noteworthy. After dropping out of school following the 11th grade, he obtained a G.E.D. and studied Human Resources at Boricua College in Brooklyn. He had been employed

---

[11](...continued)
and arguments in regard to his alleged ineffectiveness. 387 F.3d 193 (2d Cir. 2004). On remand, following the hearing, the District Court again granted the *habeas* petition, 2004 WL 2786311 (E.D.N.Y. Dec. 6, 2004), and the Second Circuit affirmed, 432 F.3d 388 (2d Cir. 2005).

as a construction worker, a mail-department supervisor at Prudential Securities, and a manager at a Taco Bell restaurant.

In addition, shortly before trial, the People offered to recommend a 15-year determinate prison term in exchange for appellant's guilty plea to first-degree manslaughter.

Considering all these factors, the sentence of 23½ years to life in prison imposed by the court, only a year and a half short of the maximum, was excessive. We respectfully ask this Court, therefore, to reduce appellant's sentence to a more appropriate term. *See* C.P.L. § 470.15[6](b).

CONCLUSION

FOR THE REASONS STATED IN POINT I, THIS COURT SHOULD REVERSE APPELLANT'S CONVICTION AND ORDER A NEW TRIAL. ALTERNATIVELY, FOR THE REASONS STATED IN POINT II, THIS COURT SHOULD REDUCE APPELLANT'S SENTENCE.

Respectfully submitted,

LYNN W. L. FAHEY
Attorney for Defendant-Appellant

JOSHUA M. LEVINE
Of Counsel
September 15, 2006

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, :

Respondent, :

- against - :

LUIS TORRES, :

Defendant-Appellant. :

-------------------------------------------------------------------X

CERTIFICATE OF COMPLIANCE
Pursuant to 22 NYCRR § 670.10.3(f)

The foregoing brief was prepared on a computer. A proportionally-spaced typeface was used, as follows:

| | |
|---|---|
| Name of typeface: | Times New Roman |
| Point size: | 14 |
| Line spacing: | Double |

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the cover page and pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 6,813.

# EXHIBIT

# B

Luis Tores , 05A 1227
Upstate Correctional Facility
P.O. Box 2001
Malone, N.Y. 12953

February 16, 2007

New York State Supreme Court Clerk
Appellate Division, Second Department
45 Monroe Place
Brooklyn, N.Y. 11201

Re: People v. Luis Torres
Appeal # 2005-01728

Dear Clerk,

Enclosed please find the required number of copies of my supplemental brief, certificate of compliance and proof of service that this brief was filed timely upon the opposing party as well.

Thank you for your time and assistance once again!

Respectfully,

Luis Torres

cc. file
* Kings County District Attorney
Renaissance Plaza, 350 Jay St.
Brooklyn, N.Y. 11201-2908

# AFFIDAVIT OF SERVICE

**STATE OF NEW YORK )**
**COUNTY OF FRANKLIN) SS.:**

Luis Torres, being duly sworn, deposes and says that:

I am the appellant in the above titled action.

I have this 16th day of February, 2007, placed and submitted within the institutional mailbox located at Upstate Correctional Facility, a true and accurate copy of my pro se supplemental brief.

To be duly mailed and delivered by First Class Mail via the United States Postal Service upon the following party to this action:

1. Kings County District Attorney
   Renaissance Plaza, 350 Jay St.
   Brooklyn, N.Y. 11201-2908

Luis Torres

Sworn to before me this
16 day of February, 2007.

**NOTARY PUBLIC**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION - SECOND DEPARTMENT

---

The People of the State of New York,

Respondent,

Ind. # 507/2004

-v-

App. # 2005-01728

Luis Torres,

Appellant.

---

# SUPPLEMENTAL BRIEF FOR APPELLANT

---

Luis Torres, 05A 1227
Upstate Correctional Facility
P.O. Box 2001
Malone, N.Y. 12953

# TABLE OF CONTENTS

Summary of Argument.......................................................................................iii

Table of Cases.......................................................................................iv-vi

Preliminary Statement.......................................................................................vii

Statement Pursuant to C.P.L.R. 5531.......................................................................................1

Questions Presented.......................................................................................2

Statement of Facts.......................................................................................3-16

Memorandum of Law.......................................................................................17-32

Certificate of Compliance.......................................................................................33

**ARGUMENT:**

POINT ONE: The crimes of conviction were not proven beyond a reasonable doubt

POINT TWO: The verdict was against the weight of the evidence

POINT THREE: The appellant received ineffective assistance of trial counsel

# TABLE OF CASES

STATUTORY AUTHORITIES:

C.P.L.§ 70.20

CPL § 470.15(5)

Penal Law § 15.25

C.P.R. Canon 5 E.C. 5-1, D.R. 5-101

C.P.R. Canon 6, E.C. 6-1, D.R. 6-101

C.P.R. Canon 7, E.C. 7-1, D.R. 7-101

CONSTITUTIONAL PROVISIONS:

U.S. Const. Amend. VI

U.S. Const. Amend. XIV

N.Y. Const. Art 1 § 6

NEW YORK STATE COURTS:

People v. Forte, 233 AD2d 358, 636 NYS2d 47

People v. Ross, 208 AD2d 962, 617 NYS2d 885

People v. Maldonado, 126 AD2d 670, 510 NYS2d 712.

People v. Nieves, 135 AD2d 579, 522 NYS2d 166

People v. Cabey, 85 NY2d 417, 626 NYS2d 20, 649 NE2d 1164

People v. Contes, 60 NY2d 620, 467 NYS2d 349, 454 NE2d 932.

People v. Wong, 81 NY2d 600, 608, 601 NYS2d 440, 619 NE2d 377

People v. Eldridge, 302 AD2d 934, 755 NYS2d 193.

People v. Bleakley, 69 N.Y.2d 490 (1987).

People v. Lebron, 184 A.D. 2d 784, 785 (2 Dept. 1992)

NEW YORK STATE COURTS (cont'd):

People v. Harper, 75 N.Y.2d 313, 316, 552 N.Y.S.2d 900, 552 N.E.2d 148

People ex. rel. McCracken v. Miller, 291 N.Y.55, 50 N.E.2d 542

People v. Perry, 61 NY2d 849, 473 NYS2d 966, 462 NE2d 143

People v. Orr, 35 NY2d 829, 362 NYS2d 862, 321 NE2d 733

People v. Jones, 27 NY2d 222, 316 NYS2d 617, 265 NE2d 446

People v. Butler, 84 NY2d 627, 620 NYS2d 775, 644 NE2d 1331

People v. Smith, 643 N.Y.S.2d 315, 169 Misc.2d 581, (N.Y.Sup. 1996).

People v. Roman, 658 N.Y.S.2d 196, 172 Misc.2d 339 (N.Y.Sup. 1997)

People v. Flores, 615 N.Y.S.2d 662 at 666, 84 N.Y.2d 184 (N.Y. 1994)

People v. Sides, 75 NY2d 822, 552 NYS2d 555

People v. Smith, 25 AD3d 573, 807 NYS2d 402

People v. Lopez, 95 AD2d 241

People v. Larkins, 10 A.D.3d 694, 781 N.Y.S.2d 782;

People v. Modica, 64 NY2d 828; 829, 486 NYS2d 931

People v. Baldi, 54 NY2d 137, 147, 444 NYS2d 893

People v. Grant, 297 AD2d 350

People v. Benvenuto, 91 NY2d 708, 712

People v. Henry, 95 NY2d 563, 566

People v. Brown, 300 AD2d 314, 315

People v. Flores, 84 NY2d 184, 188-189, 615 NYS2d 662, 639 NE2d 19

People v. Peterkin, 27 AD3d 666,667, 815 NYS2d 103

People v. Rose, 307 AD2d 270, 271, 761 NYS2d 686

People v. Droz , 39 NY2d 457, 384 NYS2d 404

People v. Ferguson, 114 A.D. 2d. 226, 229-230

People v. Bennett, 29 N.Y.2d 462, 329 N.Y.S.2d 801

UNITED STATES COURTS:

In Re Winship, 397 U.S. 358, 364

Strickland v. Washington, 466 U.S. 668 (1984)

Jackson v. Virginia, 443 U.S. 319

United States v. Fessel, 531 F.2d 1275

United States v. Elkins, 528 F.2d 236

United States v. Toney, 527 F.2d 716

United States v. De Coster, 487 F.2d 1197

United States v. Raddatz, 447 U.S. 667, 677

Matthews v. Eldridge, 424 U.S. 319

OTHER LEGAL REFERENCES:

N.Y. Practice, Criminal Law §6:26.

"Verdicts Against Weight of Evidence" Barry Kamins, N.Y.L.J., 9/21/94, Pg.1, Col.1

## PRELIMINARY STATEMENT

This is an appeal of a conviction in the Kings County Supreme Court before the Hon. Carolyn Demarest, J.S.C., on the date of February 17, 2005. Appellant's counsel, Joshua Levine, Appellate Advocates, 2 Rector Street, 10 Floor, New York, N.Y. 10006, filed the direct appeal brief in this matter, a copy of which was submitted on the date of September 15,2006.

NEW YORK STATE SUPREME COURT
APPELLATE DIVISION - SECOND DEPARTMENT
The People of the State of New York,
Respondent,

-v-

Luis Torres,
Appellant.

Statement pursuant to C.P.L.R. § 5531

1. The Indictment # : 507/04.

The Appellate Division Docket # : 2005-01728.

2. Appellant: Luis Torres.

Respondent: The People of the State of New York

3. Appellant was convicted after a jury trial in Kings County Supreme Court before the Hon. Carolyn Demarest, J.S.C., of Murder in the 2nd degree (P.L. 125.25), for which he was sentenced to an indeterminate term of from 23½ years to life.

4. Appellant has filed a timely notice of appeal on the matter.

5. Joshua Levine, Appellate Advocates, 2 Rector Street, 10 Floor, New York, N.Y. 10006, filed the direct appeal brief in this matter, a copy of which was submitted on September 15, 2006.

6. Appellant was granted permission to submit a Supplemental Brief by the date of March 1, 2007, on November 13, 2006, by this Court.

# QUESTIONS PRESENTED

1. Were the crimes of conviction proven beyond a reasonable doubt? No.

2. Was the verdict against the weight of the evidence? Yes.

3. Did the appellant receive ineffective assistance of trial counsel? Yes.

# STATEMENT OF FACTS

On February 17, 2005, the appellant was convicted in Kings County Supreme Court, Judge Carolyn Demarest, of Murder in the Second Degree, P.L. § 125.25[1], and received as a result a sentence of 23½ years to life. Appellate counsel filed a brief on September 15, 2006, with two legal points of argument. One, if appellant was deprived of a fair trial when the prosecutor, in summation, and the court, in its final charge, told the jury that the law presumes that a person intends the natural and probable consequences of his actions, where the jury had to decide whether the appellant intended to kill or merely to cause a nonfatal serious injury. And two, that the appellant's sentence, close to the maximum allowed, was excessive in light of his minimal criminal justice history and his work and educational background.

As an initial matter, the appellant prays the Court take into consideration that he is a layman of the law and therefore that it broadly construe these pleadings based on his position as a pro se litigant. The appellant hopes the Court would also consider these annexed issues. First, that the crimes of conviction were not proven beyond a reasonable doubt. Secondly, that the verdict was against the weight of the evidence. Finally, that appellant received ineffective assistance of trial counsel, as the record clearly and conspicuously demonstrates.

These issues do not conflict in any way with the previous issues submitted by appellate counsel. Hopefully, they will enhance the appealable issues, such as obvious procedural errors that the appellant has had to contend with when he received this harsh sentence based on a theory of murder that was not proven beyond a reasonable doubt, and a verdict that was against the weight of the evidence. There were several factors surrounding this appellant's conviction that ultimately should be closely examined by this appellate court.

There was conflicting testimony made by the state's identifying witnesses. The people's witness, Sergey Hurtin, viewed four lineups. In the second lineup he picked out someone that was not a suspect. In two other lineups he identified the appellant as having been "one of the people who ran towards us, but I don't recall specifically." (T.228, L.14-15). He also admitted on cross examination that he had been drinking alcohol heavily for over fourteen hours before the incident. Later on cross examination he also admitted that he did not remember how and when he participated in either the first or the second fight. It should be noted that the first fight between the Russian men and the Hispanic men was less violent than the second fight. It should also be noted that the appellant admitted to participating in the first fight up until the time that he was hit over the head with a heavy duty industrial city garbage can, at which time he was unable to fight due to his injuries.

The state's witness, Sergey Gorlov, also admitted that he was consuming large doses of alcohol for fourteen hours before the incident occurred. He admitted that he did not even remember what the assailant holding the baseball bat looked like. (T.283, L.11-12) Nowhere did he mention anyone assisting an assailant by holding up the decedent so that he could be hit by a baseball bat wielding assailant. Therefore, the testimony of the state's witness, Ramon Ortiz Perez (aka-"Monchy"), who signed a cooperation agreement so he could receive a more lenient sentence, is incredible.

At one point Perez contradicts another witnesses testimony by stating that he was the one who threw the city garbage can and that the can was thrown at one of the Russian men, when the appellant was actually hit over the head by that garbage can thrown by one of the Russians. At another point he states that the appellant took the bat from his cousin, who had just hit another Russian over the head knocking him to the ground. There is insufficient evidence that two Russians were hit over the head by one baseball bat by two different assailants in the second fight that lasted less than two minutes. He also claims that he is the one who went into the backyard after the incident and burned the baseball bat. It should be noted that this witness had a past history of domestic violence, suicidal behavior and other violence and drug related criminal acts at the time he gave his testimony at the appellant's trial. Inferences were made that Perez rehearsed his testimony before taking the stand.

"Monchy" Perez admitted that he had met with the prosecutor on several occasions to go over his testimony, which is a form of rehearsal. He also admitted that he had been drinking alcohol and smoking marijuana on the night of the incident. Intoxication plays a serious role in the identification factors and the defense of the appellant. It was not adequately considered at the time of the appellant's trial. This witness also admitted that he too wore a "black jacket" that was part of the identification the night of the incident in which everyone there was intoxicated. He states that he was trying to help the appellant because he felt that the appellant was in danger and outnumbered.

Further analysis of the character of this witness reveals that he was abusive to his wife, Marilyn Diaz, that orders of protection were placed upon him for being physically abusive to her on more than one occasion and that he had threatened to kill or stab up anyone she got involved with when he got out of jail , or if she ended up with a new man while he was incarcerated, and that he was determined to do anything to get out of jail. He admitted on cross examination testimony to writing and mailing the letters out to Marilyn Diaz, with the aforementioned contents. Although the jury never had the opportunity to review the contents of these letters, the above mentioned facts were admitted to by "Monchy" Perez, and are official records of the trial transcript that should be considered in this appeal.

"Monchy" Perez also had mental health issues that he denied having during his trial testimony. He was on a mental observation ward at Rikers Island due to his suicidal behaviors previous to and during the appellant's trial. His mental illness seems to be extensive. For the jury to have considered this witnesses testimony as being credible in light of his mental condition is an important aspect of the appellant's plea to this Court to consider the evidentiary value of such testimony, when other witnesses explicitly describe very differently the facts as they occurred on the night of the incident in question. On several occasions Perez cut himself with any object that would cause lacerations so he could be returned to his housing unit before being transported to court, to avoid being confined in special housing units, to aviod being transferred to other facilities in Rikers Island and to basically get whatever he wanted while he was being held as a witness with a pending criminal case.

The state's witness, Anthony Garcia, contradicted everything that Gorlov, Hurtin and Perez stated during their collective testimonies. First off, Garcia's testimony about him following fifteen feet behind appellant and his codefendant Angel Sanabria (aka "Doe), to the crime scene at midnight is incredible. The appellant and his cousin Angel would have easily seen someone following behind them so closely on the abandoned Jefferson Street at that late hour.

He also said "Doc" watched while the appellant was assaulted on the corner of Jefferson St. and Wilson Ave. by "Charlie" in a separate earlier incident. Meanwhile, he says that both "Doc" and the appellant thereafter acted in concert in two coordinated gang assaults around the block on Jefferson St. and Knickerbocker Ave.

Furthermore, Garcia's description of the incident as he saw it is contradictory to other testimony. However, Garcia did say that he saw the appellant get a bottle broken over his head on Wilson and Jefferson, and then on Jefferson and Knickerbocker he got hit over the head with an industrial city garbage can, that brought him to his knees and he had to "get himself together" after that occurred.

Garcia is suspiciously over-descriptive, and in doing so he ends up contradicting many particulars of the second fight. Such particulars as who was involved, who hit who, who used a bat on who, who wore what clothing, where exactly each and every part of the incident occurred. Garcia said "Monchy" Perez was not there at the scene, contradicting testimony of "Monchy" Perez, who was a codefendant in the incident. Garcia described the car that produced the bat as being burgundy, that it came up Knickerbocker Avenue, when all other witnesses described the auto as white and it having been on Jefferson Street.

For a witness who was so conspicuously over-descriptive to have made so many testimonial contradictions to the facts before the court from other testimony makes his version of the events in question incredible on its face. Therefore, the testimonial evidence of Garcia and Perez herein is particularly tailored to meet the needs of the prosecution in this case. It should be common sense that a fight of this nature that escalated into a second more violent brawl that may have involved others not even named in the indictment would have been difficult to accurately eyewitness. The Russians assaulted who gave testimony, Hurtin and Gorlov, provided facts as close to the truth as possible herein. Although their testimonies do not meet the needs for conviction, it is much more reasonable that anyone viewing the row would have had difficulty describing what and how these events transpired.

On the other hand, Giovanni Lema, the dispatcher from Bushwick Car Service on the corner of Jefferson Street and Knickerbocker Avenue, who gave testimony about the incident, stated that he was observing the melee from his dispatcher's chair in the car service on the corner. He said that immediately before the incident had occurred that one of the Russians who was involved in the brawl walked into the neighborhood car service in a drunken state demanding vodka, twice stating drunkenly "I want vodka." (See: T. 32, L.9-12). Because the Russian men were acting rowdy and unpredictable, a fight with the Hispanics shortly became inevitable.

He also stated that the incident occurred on the other side of Knickerbocker Avenue. The windows of the car service are very small and face the street. From inside the car service it would be extremely difficult to see on a cross angle something that began nearly a half city block away from the other side of Knickerbocker Avenue, especially late at night when visibility is much less available, particularly from a seated position inside the car service. Lema further stated that he was receiving and logging in calls for car services while the incident was in progress. He stated during his cross examination that he received three or four calls. Then he says that he stopped and observed the remainder of the second fight. He said it was two to three minutes between the first and the second fight's occurrence, enough time for the appellant to have returned to his home less than one block away. By that time the appellant was actually already a long block away from the incident trying to get medical assistance for his head injury, making phone calls for a taxi to Wyckoff Hospital. The appellant questions why Lema says he saw what he saw on the night of the incident when no other vendors in the bodegas or restaurant saw the incident and they had a much better view of the fight. Although Lema claims that he knew the appellant from previously seeing him on the corner two or three times, he really could not have seen the appellant too often because the appellant was only back from Puerto Rico for approximately one year and he was working construction on day hours all that time while Lema worked 11:00 PM to 7:00 AM.

Furthermore, Perez had a black jacket on, and walked away with the bat, fitting Lema's description much more suitably. He also states that he could not recognize anyone involved, particularly who the person with the black jacket was because it was dark. He states further that he could not see the appellant's face or if he was bleeding at that time. The appellant submits he is not the only one in Bushwick who had long hair and a black jacket on that night, even at the fight incident, as testimony reveals. Lema also stated that he saw no Hispanic man at the incident bleeding when other witnesses stated during testimony that the appellant was bleeding from a head injury.

There were several other mitigating factors that were not properly considered by the jury. Primarily, it is significant that the appellant was seriously injured by assault twice before he was allegedly involved in a deadly assault, and that the fight involved so many participants that the eyewitness identification of the appellant as the primary assailant in the course of what turned into a deadly fight could be considered unreliable. The Kings County Supreme Court also permitted several procedural errors to occur that allowed for him to have less than a fair trial. From the arbitrary behavior of the trial judge, to the factor of appellant's being provided inadequate defense counsel, to the process that was not truly an adversarial trial process, it is evident that the appellant received less than a fair trial, that the verdict was against the weight of the evidence.

It should be also apparent from the court record that the appellant received inadequate or ineffective assistance of trial counsel at critical stages, in violation of the mandatory statutory guidelines of the state and federal constitutions.

The appellant's defense counsel requested that the court charge the jury with a justification defense. The court denied the application, explaining that the circumstances surrounding the fight and the appellant's involvement preclude a justification defense. However, the fact that alcohol and drugs were involved in a very significant way give rise to the fact that the appellant's counsel was ineffective at trial. This can be considered much more than a poor trial strategy. This error was very harmful to the outcome of the appellant's case. It should be noted that intoxication is not considered, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the appellant may be offered by the appellant whenever it is relevant to negate an element of the crimes charged.

The appellant admitted to his defense counsel that he had been heavily consuming alcohol and marijuana on the night of the incident, and therefore he was intoxicated and impaired at that time. It is obvious that the appellant did not have the requisite intent to cause the death of the decedent, Valery Charnavus, for several reasons that are stated herein.

The appellant submits at this time that he also could not have formed the intent necessary to have committed murder in the second degree due to his intoxication on the night of the incident. The jury never had an opportunity to hear this issue at the time of trial due to the fact that defense counsel at that time never submitted an intoxication charge to the court. It is also material to this case that in instances where intoxication or drug related impairment are factored into consideration as part of the commission of a criminal offense, in determining whether the appellant had the requisite culpable mental state or was intoxicated or impaired at the time of the offense, a request for an appropriate lesser included offense might be necessitated. Although this does not mean that it is automatic that when, as here, the appellant was intoxicated or impaired immediately prior to the criminality he should receive a lesser included offense charge. However, under these obvious circumstances, it would have been entirely appropriate for the jury to have heard an intoxication charge in consideration of the lesser included offense of manslaughter. The appellant puts forth the belief at this time that he did not have the intent to cause the death of Valery Charnavus due to the effects of intoxication upon negating the intent element. It is also of foremost importance to consider that everyone at the brawl was inebriated, under the influence of marijuana, or both drunk and impaired. This is noteworthy because identification lies at the heart of the matter in this case.

Without the already somewhat conflicting identification testimony of Perez, Garcia and Lema, the people's case is extremely outside the bounds of the necessary proof beyond a reasonable doubt required to convict, and should be considered entirely against the weight of the evidence.

The performance of trial counsel was questioned by the appellant from the beginning, even before his trial occurred. The court unreasonably objected to any reassignment of counsel when the appellant entered his requested application for reassignment of counsel pro se. The court could evidently see that there was a conflict between the appellant and his defense counsel, which went to the point where he had to question the abilities and advocacy of his attorney. It can be seen that previous to his trial, at the time of his trial, and at the time of his sentencing, defense counsel provided ineffective assistance of counsel the falls below the state and federal standards of adequate representation.

When you factor in the importance of the fact that it was the appellant's trial attorney's duty to his client to review certain items with his client and advise his client as to what to expect in the progress of this case, it is evident that trial counsel failed to take several important tactical steps to ensure that the appellant receive adequate assistance of counsel as his criminal case proceeded.

Counsel failed to locate and call significant witnesses on behalf of appellant, failed to interview available witnesses. It is also clear that the appellant was never advised that there are certain lesser included offenses which could be attached to a murder statute charged, and how this could be utilized as part of his defense at trial. The fact that the elements of the crime and the events as they occurred could definitely have been confused by the jury without clarification of the lesser included offenses attached or vigorous argument by trial counsel as to their value and consideration by a jury also reveals that this attorney was inept and that his representation was erroneous and substandard in this matter.

The appellant's trial counsel did not meet with his client, discuss the trial with his client, consider with or without his client whether or not to have a bench or jury trial, consider if appellant would testify at trial what witnesses will be called, what defense would be raised. It should be noted that the appellant was uneducated in law at the time of his trial ( a layman of the law). He was never shown how the law in his case would work dealing with the state's eyewitness' testimony. The appellant now questions how his trial attorney could have presented this case at that time with barely any proper pretrial preparation for his client in regard to the eyewitness trial testimony, never presenting the facts of certain confusing key identification factors that could have been clarified in his favor.

It is noteworthy that intoxication plays an important role in this case. When you consider the fact that everyone at the brawl was intoxicated or impaired to the extent that it would be difficult to prove beyond a reasonable doubt that the appellant committed the top count of murder in the second degree, formed the necessary intent to commit this crime or acted in concert with the other men charged with the various offenses that the jury was permitted to deliberate on herein. The mere fact that testimony during trial stated that there were many other Hispanics at the scene of the fight, besides the four people implicated in the crimes charged, reveals that all of the facts never made it into evidence in this case.

# MEMORANDUM OF LAW

## I. APPELLANT'S GUILT WAS NOT PROVEN BEYOND A REASONABLE DOUBT

The people were obligated to prove appellant's guilt of the crimes charged beyond a reasonable doubt. The evidence presented in this case did not satisfy the demanding constitutional standard as a matter of law. The reasonable doubt standard of proof could not be supported as to the appellant's conviction, where the only proof identifying him as a participant in the crimes of conviction were perjurious testimony made by hostile witnesses, and contradictory statements obtained in violation of the appellant's constitutional rights. In Re Winship, 397 U.S. 358, 364; U.S. Const. Amend. XIV; N.Y. Const. Art 1 § 6; C.P.L. § 70.20.

The standard of review for legal sufficiency of evidence to convict is whether, when viewed in light most favorable to prosecution, evidence could have led a rational trier of fact to find that elements of crime were established beyond a reasonable doubt. Very simply, the same concerns that prevent a conviction based solely upon accomplice testimony were present here. Not only is it possible that Perez was intricately involved in the death of Valery Charnavus, but it was likely that, whatever the circumstances of the death, Perez stood to gain in one way or another from his testimony. Especially since he avoided spending substantial time in jail. Surely, he would not have testified otherwise.

However, there is no proof whatsoever that the appellant had any part in the second fight where the severe injuries to the decedent occurred. The people failed to prove beyond a reasonable doubt that the appellant agreed with any of the codefendants charged in the crimes submitted to engage in or cause the performance of such conduct. Thus, the evidence is legally insufficient with respect to murder and its intent. The evidence is also legally insufficient with respect to the remaining crimes. Specifically, there was no evidence that the appellant was at the scene of the second fight, when assault on Valery Charnavus caused his death, or than the appellant was in possession of the deadly weapon at the time of the crime. People v. Forte, 233 AD2d 358, 636 NYS2d 47, People v. Ross, 208 AD2d 962, 617 NYS2d 885; People v. Maldonado, 126 AD2d 670, 510 NYS2d 712. Nor was there any evidence that the appellant was aware of the intent of the codefendants charged or aided them in any way during the second fight which caused the death of Valery Charnavus. People v. Nieves, 135 AD2d 579, 522 NYS2d 166; People v. Cabey, 85 NY2d 417, 626 NYS2d 20, 649 NE2d 1164. The evidence viewed in the light most favorable to the people establishes that at best the appellant was at or near the scene of the crime, in the company of his codefendants when the melee broke out, that he participated in the first fight that resulted in some minor injuries to himself and others. People v. Contes, 60 NY2d 620, 467 NYS2d 349, 454 NE2d 932.

However, it does not sufficiently prove that or establish proof of the appellant's commission of murder in the second degree beyond a reasonable doubt or prove that the appellant ever had the intent to cause the death of Valery Charnavus. Further, trial testimony, in and of itself is not proof beyond a reasonable doubt that the appellant committed a homicide. Without due process in a homicide case at trial it cannot be said that guilt was proven beyond a reasonable doubt when evidence of the homicide itself made the jury more willing to accept the present accusations against the appellant. People v. Eldridge, 302 AD2d 934, 755 NYS2d 193

This evidence was legally insufficient to establish that appellant was guilty of murder in the second degree. In the appellant's case, the standard of review for the sufficiency should be whether, when viewed in a light most favorable to the prosecution, the evidence could have lead rational triers of fact to find the elements of the crime of murder in the second degree were established beyond a reasonable doubt. People v. Wong, 81 NY2d 600, 608, 601 NYS2d 440, 619 NE2d 377. Here, while the evidence was sufficient to show that Charnavus was the victim of a deadly assault, as to the appellant, at best it showed no more than that he was present at the scene previous to the time the deadly assault occurred. This is not enough to establish his guilt beyond a reasonable doubt. People v. Forte, 233 AD2d 358, 636 NYS2d 47.

Thus, the appellant's conviction for murder in the second degree should be vacated and the indictment dismissed due to the fact that the jurors simply ignored the incredible nature of Perez's testimony as well as his strong motive to fabricate evidence. People v. Forte, 233 AD2d 358, 636 NYS2d 47.

Those deficiencies in the testimony and unconstitutionally procured statement in contrast with all the other contradicted testimony presented by the defense rendered the People's proof that the appellant committed these crimes too weak to support a verdict of guilt beyond a reasonable doubt.

Obviously, evidence that the appellant was in the company of his codefendants near the scene of the deadly assault shortly before its commission is insufficient evidence to support a conviction for murder in the second degree, absent evidence that the appellant was there at the time that the appellant was seriously injured, possessed the bat that was allegedly used to kill the decedent, was aware of the codefendants plan to injure or kill Valery Charnavus, shared their intent, or aided them in any way. People v. Eldridge, 302 AD2d 934, 755 NYS2d 193.

## II. THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

Without other corroborating or supporting evidence of the appellant's involvement to the extent that there is no proof of intent to cause the death of Valery Charnavus, it is evident that the weight of Lema, Perez and Garcia's trial testimony, under such circumstances described could not support a verdict of guilt, making it against the weight of the evidence. People v. Bleakley, 69 N.Y. 2d 490 (1987).

Indeed the jurors were not provided any satisfactory explanation as to why they should credit Perez's trial version in favor of his initial false account. If there was any truth to Perez's story about the appellant's part in the decedent's death, those circumstances provided Perez with an alibi to exonerate himself as a witness. Thus, these convictions should be reversed. People v. Bleakley, supra.

A fortiori, while, generally, issues of credibility should be left to the fact finder, appellate courts are not required to accept testimony that appears "manifestly untrue, physically impossible, contrary to experience, or self contradictory". Accordingly, in this instance the appellant's conviction must be reversed and the indictment dismissed because it is a conviction that was obviously against the weight of the evidence. People v. Lebron, 184 A.D. 2d 784, 785 (2 Dept. 1992)

The standard for evaluating legal sufficiency of evidence is whether viewing the evidence in the light most favorable to the prosecution there is any valid line or reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury and as a matter of law satisfy proof and burden requirements for every element of the crimes charged. People v. Harper, 75 N.Y.2d 313, 316, 552 N.Y.S.2d 900, 552 N.E.2d 148; People v. Bleakley, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672; People v. Contes, 60 N.Y.2d 620, 621, 467 N.Y.S.2d 349, 454 N.E.2d 932.

On the other hand, in determining whether a verdict is against the weight of the evidence, the appellate court must undertake an independent review of the evidence and, if a different result would not have been unreasonable, must weigh the relative probative force of the conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony. People v. Bleakley, supra; People ex. rel. McCracken v. Miller, 291 N.Y.55, 50 N.E.2d 542. After review by the appellate court, if the court determines that the trier of fact did not give the evidence the proper weight, it may set aside the verdict. People v. Bleakley, supra. In this case, the appellant contends that Lema, Perez and Garcia's testimony is conflicting the factual account of what occurred. Without their testimony a different result would not have been unreasonable.

Intoxication also plays a factor that was not considered in light of this verdict that the appellant now inserts is against the weight of the evidence. Although intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant charged with a crime has relevance and may be offered by the defendant whenever it is relevant to negate an element of the crime charged. Penal Law § 15.25.

The charge of intoxication should be given if there is sufficient evidence of intoxication in the record, irrespective of the source of the evidence, for a reasonable person to entertain doubt as to the requisite culpable mental state, such as intent. People v. Perry, 61 NY2d 849, 473 NYS2d 966, 462 NE2d 143; People v. Orr, 35 NY2d 829, 362 NYS2d 862, 321 NE2d 733. A charge that informs the jury that they may, rather than they must consider evidence of intoxication as negating a specific intent is proper, People v. Jones, 27 NY2d 222, 316 NYS2d 617, 265 NE2d 446. While in a great many cases an intoxication charge is appropriate, a request for a lesser included offense might also be appropriate even though it might not necessarily trigger a corresponding obligation to charge a lesser included offense. People v. Butler, 84 NY2d 627, 620 NYS2d 775, 644 NE2d 1331. The appellant herein requests the Court review the sufficiency of evidence in light of intoxication and find the verdict was against the weight of the evidence.

In this case it would have been in the best interest of the appellant, had he the opportunity to have the jury hear the intoxication charge on an evidentiary level, based on lesser included crimes of homicide. If an aggravating element elevates a homicide from one level of felony to a higher level, the lower level offense will be a lesser included offense of the higher one. N.Y. Practice, Criminal Law §6:26.

Pursuant to Criminal Procedure Law, the Appellate Division can reverse a conviction which is against the weight of the evidence. CPL § 470.15(5). Pursuant to the weight of the evidence analysis, the Appellate Division must weigh the credibility of each witness, draw inferences from the facts and determine whether the jury properly resolved conflicting testimony by giving the proper weight to each portion of the testimony. "Verdicts Against Weight of Evidence", Barry Kamins, N.Y.L.J., 9/21/94, Pg.1, Col.1 In essence, a "[w]eight of evidence analysis involves a discretionary balance of many factors based upon the court's common sense reaction to the evidence in light of its collective experience. People v. Lopez, 95 AD2d 241. Factual analysis differs clearly from review of legal sufficiency of evidence. The Court's determination in this case, involves questions of law and the Court must assess whether, after viewing evidence in the light most favorable to the people, any rational fact trier could have found the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 319; see also: CPL § 470.15(5).

## III. DEFENDANT WAS DENIED PROCEDURAL DUE PROCESS, THROUGH INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF U.S. CONSTITUTION, AMENDMENT VI, AND THE N. Y. S. CONSTITUTION, ARTICLE 1, SECTION 6

A defendant in a criminal case has a constitutional right to the effective assistance of counsel. People v. Larkins, 10 A.D.3d 694, 781 N.Y.S.2d 782; U.S. Const. 6th Amend.; N.Y. Const., art. 1, §6. Although the State constitution entitles a defendant to "meaningful representation" rather than perfect representation. People v. Modica, 64 NY2d 828; 829, 486 NYS2d 931; People v. Baldi, 54 NY2d 137, 147, 444 NYS2d 893; People v. Grant, 297 AD2d 350; People v. Benvenuto, 91 NY2d 708, 712, "meaningful representation" includes "a prejudice component which focuses on the 'fairness of the process as a whole rather than [any] particular outcome of the case' People v. Henry, 95 NY2d 563, 566, quoting People v. Benvenuto, supra at 714, People v. Brown, 300 AD2d 314, 315. Thus, "[i]solated errors in counsel's representation generally will not rise to the level of ineffectiveness, unless the error is 'so serious that defendant did not receive a "fair trial"'" People v. Henry, *supra* at 565-566, 721 NYS2d NYS2d 577, 744 NE2d 112, quoting People v. Flores, 84 NY2d 184, 188-189, 615 NYS2d 662, 639 NE2d 19; People v. Peterkin, 27 AD3d 666,667, 815 NYS2d 103; People v. Rose, 307 AD2d 270, 271, 761 NYS2d 686. In the particular circumstances presented herein, that is the case. It should be understood that the appellant from the outset of trial was not satisfied with his incompetent trial counsel's substandard representation.

In People v. Droz , 39 NY2d 457, 384 NYS2d 404, the court concluded that defendant's representation, under all the circumstances presented, could not be considered "adequate or effective in any meaningful sense of the words." The traditional standard has been whether the attorney's shortcomings were such to render the trial a farce and a mockery of justice. A newer stricter standard developed predominantly in the Federal courts. See: United States v. Fessel, 531 F.2d 1275; United States v. Elkins, 528 F.2d 236; United States v. Toney, 527 F.2d 716, Cect. Den. 429 U.S. 838, 97 S. Ct. 107, 50 L.Ed.2d 104; United States v. De Coster, 487 F.2d 1197, is whether the attorney exhibited "Reasonable Competence". See also: United States v. Raddatz, 447 U.S. 667, 677; and Matthews v. Eldridge, 424 U.S. 319.

In the appellant's case these standards were never met during the trial process. Advocacy calls for the trial court to provide the appellant with counsel that should have effectively represented his interests. In the first paragraph of section six of article one of the New York State Constitution it clearly states that the accused shall have the right under color of law to the following: "[N]o person shall be held to answer for a capital or otherwise infamous crime.....unless on indictment of a grand jury." It further states in the second paragraph of the New York State Constitution , Article 1, Section 6: "[N]o person shall be deprived of life, liberty or property without due process of law." N.Y. Constitution, Article 1 § 6.

Procedural Due Process is defined in Black's Law Dictionary as: " [T]he minimal requirement of notice and a hearing guaranteed by the Due Process Clauses of the 5th and 14th Amendments (of the U. S. Constitution), especially if the deprivation of a significant life, liberty , or property interest may occur." In the case at bar the appellant was denied the effective assistance of counsel in a multitude of ways, and therein he was denied due process of law.

It has been long held by the U.S. Supreme Court that a set criteria must be met by trial counsel in the performance of his duties in the defense of a client. Though there is no inflexible standard applicable to all cases against which an attorney's effectiveness will be measured, trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness. The Court must look at the totality of counsel's representation and the circumstances of a particular case in order to determine if counsel provided meaningful representation. In defendant's case, trial counsel failed to meet the requirements as set forth in U.S. Constitutional Amendment VI; and in N.Y. Constitution, Article 1 § 6. Counsel's ineffectiveness is proven by failure to properly challenge the illegality of the arrest or indictment process and investigate a defense strategy. Counsel's failure to investigate facts of the case are proven by counsel's lack of any strategy during trial in relation to the minimum requirements of trial counsel's advocacy and representation.

Such standards were not met pursuant to the leading case on ineffective assistance of counsel. People v. Baldi, 54 N.Y. 2d 137. The standard to be applied in determining whether a defendant has been denied the right to effective assistance of counsel was articulated by the U.S. Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), and by the New York Court of Appeals in People v. Baldi, 54 N.Y. 2d.137 (1981) These decisions concluded that a defendant's Federal and State rights to effective representation have been met when (1) the evidence, the law, and the circumstances of a particular case, viewed in totality, reveal that defense counsel "provided meaningful representation", People v. Baldi, supra at 147, and (2) the claimed errors of counsel did not prejudice the defendant, that no reasonable probability exists that the outcome of the proceedings were affected by counsels errors. Strickland v. Washington, supra 466 U.S., at 694; People v. Ferguson, 114 A.D. 2d. 226, 229-230 (1st. Dept. 1986) While trial counsel's failure to investigate relevant facts pertaining to alibi or defense can be considered to be a "tactical consideration," there can be no adequate explanation as to what the defense tactic or strategy was, nor can any other reasonable explanation be offered why counsel, based on the facts as he knew them, failed to assert the claims of interference with an existing attorney client relationship, and his right to counsel, which were thoroughly consistent with the appellants assertions.

This appellant's counsel failed to act competently and zealously on the appellant's behalf on all matters stated herein. Thus, rendering him ineffective to his client. C.P.R. Canon 5 E.C. 5-1, D.R.-5-101; Canon 6, E.C. 6-1, D.R. 6-101; and Canon 7, E.C. 7-1, D.R. 7-101. In order to show that defense counsel was constitutionally ineffective, an appellant must show (1) that the representation fell below objective standards of reasonableness measured by a prevailing professional norm; and (2) prejudice. Strickland v. Washington, 466 U.S. 688, 694 (1984). There is absolutely no evidence that counsel competently or adequately investigated the scene of the incident, either himself or by means of an investigator. Furthermore, counsel imprudently failed to hire an investigator competent enough to assist him preparation for trial. When a defendant presents counsel with a single avenue of defense it is defense counsels duty to the defendant to investigate every possible avenue of that defense. As the Court in People v. Bennett, 29 N.Y.2d 462, 329 N.Y.S.2d, 801 clearly states:

> "Clearly, then, where, as in the present case, the record unequivocally demonstrates a complete lack of investigation or preparation whatever on the only possible defense available, the lawyer, far from providing the sort of assistance which the Constitution guarantees to the most lowly defendant, has, in truth, rendered 'the trial a farce and a mockery of justice' (quoting Peo. v. Brown)

Counsel's overall lack of investigation, poor preparation, failure to understand facts and law of case, and failure to pursue reasonable consistent trial strategy without preparation constituted cognizable, actual prejudice that had probable effect on outcome on verdict and denied defendant a fair trial for purposes of ineffective assistance of counsel claim. U.S.C.A. Const.Amend. 6; People v. Smith, 643 N.Y.S.2d 315, 169 Misc.2d 581, (N.Y.Sup. 1996). Appellant's right to testify should be exercised after full consultation with defense counsel. Defense counsel bears primary responsibility for advising defendant of his right to testify or not to testify and strategic implications of each choice; counsel also bears primary responsibility for advising defendant that it is ultimately for himself to decide. People v. Roman, 658 N.Y.S.2d 196, 172 Misc.2d 339 (N.Y.Sup. 1997). This was not the case herein.

The only logical reason available, this appellant can see, for counsel to not have requested or investigated relevant trial issues, or not have made relevant motions in behalf of hearings in advocacy of defendant's trial strategy is simple, counsel never intended to take on the adversarial role against the People that his position as defense counsel requires under the Codes of Professional Responsibility. People v. Flores, 615 N.Y.S.2d 662 at 666, 84 N.Y.2d 184 (N.Y. 1994). Counsel was merely there to facilitate the District Attorney in his/her pursuit of a conviction and to get it as soon as possible.

Finally, the appellant announced on record before the start of the trial and through moving papers that he wanted to dismiss his trial counsel and have new counsel assigned to represent him due to his claim that his then present counsel was inadequate to represent him in his murder case at trial. The Court outright refused to reassign him new counsel in violation of his right to have new counsel assigned, when it failed to make even minimal inquiry as to the nature of the disagreement with this then present counsel or its potential for resolution prior to denying his application or motion. People v. Sides, 75 NY2d 822, 552 NYS2d 555; see also: People v. Smith, 25 AD3d 573, 807 NYS2d 402

WHEREFORE, the appellant requests that the Court consider these facts in union with the attached memorandum of law, reverse his conviction, and grant him the opportunity to receive a fair trial where the jury has an opportunity to prove beyond a reasonable doubt whether or not he committed these offenses, whether or not the verdict was against the weight of the evidence, and with meaningful effective representation of trial counsel.

Dated: February 16, 2007

Respectfully,

__________________________

Luis Torres

NEW YORK STATE SUPREME COURT
APPELLATE DIVISION - SECOND DEPARTMENT
The People of the State of New York,
Respondent,

-v-

Luis Torres,
Appellant.

CERTIFICATE OF COMPLIANCE
Pursuant to 22 NYCRR § 670.10.3(f)

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

| | |
|---|---|
| Name of typeface: | Garamond |
| Point size: | 14 |
| Line spacing: | Double |

The total number of words in the brief, inclusive of point headings and exclusive of the cover page and pages containing the table of contents, preliminary statement, summary of argument, proof of service, the authorized addendum containing statutes, rules and regulations, etc., is 7257.